1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**
**AT SPOKANE**

9

RAYMOND BALESTRA, individually and on behalf of all others similarly situated,

Case No. 2:18-cv-00103

10

Plaintiff,

**CLASS ACTION**

11
12

v.

**CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(a)(1) AND 15(a) OF THE SECURITIES ACT OF 1933**

13
14

GIGA WATT, INC., GIGAWATT PTE LTD., CRYPTONOMOS PTE. LTD., AND DAVE CARLSON

**JURY TRIAL DEMANDED**

15

Defendants.

16
17
18
19
20
21
22
23
24
25
26
27

CLASS ACTION COMPLAINT - i

1    Plaintiff Raymond Balestra ("Plaintiff"), individually and on behalf of all other individuals

2    and entities similarly situated, by his undersigned attorneys, alleges in this Complaint for violations

3    of Sections 12 and 15 of the Securities Act of 1933 (the "Securities Act"), the following, based upon

4    knowledge with respect to his own acts, and upon facts obtained through an investigation conducted

5    by his counsel, which included, *inter alia*: documents and solicitation materials released by

6    Defendants (defined below), in connection with the Giga Watt ICO (defined below), and public

7    statements made by Defendants concerning the Giga Watt ICO.  Plaintiff believes that further

8    substantial evidentiary support will exist for the allegations set forth herein after a reasonable

9    opportunity for discovery.  Many of the facts supporting the allegations contained herein are known

10    only to Defendants or are exclusively within their control.

11    <u>**NATURE AND SUMMARY OF THE ACTION**</u>

12    1.    Plaintiff brings this action on behalf of himself and all other individuals and entities

13    similarly situated against Giga Watt, Inc., GigaWatt Pte. Ltd. (collectively, "Giga Watt"),

14    Cryptonomos Pte. Ltd. ("Cryptonomos"), and Dave Carlson ("Carlson," and together with Giga Watt

15    and Cryptonomos, the "Defendants") for violation of Sections 12(a)(1) and 15(a), 15 U.S.C. §§

16    77l(a)(1), 77o(a), of the Securities Act.

17    2.    Specifically, in connection with the Giga Watt initial coin offering, which ran from

18    approximately May 19, 2017 through July 31, 2017 (the "Giga Watt ICO"), Defendants raised over

19    $20 million in bitcoin ("BTC"), ethereum ("ETH"), and fiat currencies by offering and selling

20    unregistered securities, in the form of Giga Watt Tokens ("WTT Tokens"), in direct violation of the

21    Securities Act.

22    3.    Defendants made extensive efforts to solicit investors by stressing Giga Watt's

23    purported cost effective mining services and touting various income-generating uses for the WTT

24    Tokens that ICO participants were expected to receive in exchange for their investments.  More

25    specifically, Defendants marketed the WTT Tokens as an Ethereum-based cryptocurrency/digital

26    currency which would purportedly provide the "right to use the Giga Watt processing center's

27    capacity, rent-free for 50 years, to accommodate 1 Watt's worth of mining equipment power

CLASS ACTION COMPLAINT - 1

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  consumption."[1]  Additionally, Defendants claimed that the WTT Tokens would provide investors

2  with the exclusive right to the "purchase and delivery of mining equipment through [GigaWatt Pte.

3  Ltd.] with its subsequent setup and hosting at Giga Watt's facilities in Wenatchee, WA."[2]

4      4.    In connection with the Giga Watt ICO, Defendants released a White Paper which

5  described various aspects of Giga Watt's business model and purported benefits to purchasing WTT

6  Tokens.  For example, the Giga Watt White Paper claimed that WTT Tokens would derive their

7  value from the functionality, usefulness, efficiency, and availability of the "Giga Watt Project".[3]

8  Defendants described the "Giga Watt Project" as a partnership between Giga Watt, Inc. and Giga

9  Watt Pte. Ltd., pursuant to which Giga Watt, Inc. would provide, *inter alia*, "turnkey mining

10 services" and solutions, and Giga Watt Pte. Ltd. would sell mining equipment used in Giga Watt's

11 mining facilities.[4]  These mining facilities are what Giga Watt calls "Giga Pods," which purportedly

12 "take[] advantage of the mining hardware's extremely high power density, avoid[ing] active cooling

13 consumption, and sav[ing] power for high-efficiency mining, thus minimizing costs in every aspect

14 of mining operations."[5]

15     5.    Essentially, participants in the Giga Watt ICO were sold the opportunity to make a

16 return on their investment by (1) earning income from utilizing Giga Watt's mining services which

17 investors would be given the right to access to through their purchase of WTT Tokens; (2) trading

18 WTT Tokens on cryptocurrency/digital currency exchanges for a profit; or (3) renting out WTT

19 Tokens to other digital currency miners so as to receive rental income.

20     6.    Rather than immediately deliver the WTT Tokens investors purchased during the

21 Giga Watt ICO, Defendants decided to issue WTT Tokens in stages.  That is, a specific batch of

22 WTT Tokens was to be issued when, or if, Giga Watt was able to successfully develop new Giga

---

[1]    *See* Giga Watt's Token Launch White Paper (the "White Paper"), available at https://wtt.cryptonomos.com/white-paper.pdf at pg. 12.

[2]    *Id*. at pg. 5.

[3]    *Id*.

[4]    *Id*.

[5]    *Id*. at pg. 10.

CLASS ACTION COMPLAINT - 2

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Pods.  For example, the White Paper stated that the first batch of WTT Tokens, amounting to 5.4 million WTT Tokens, was issued on August 7, 2017, whereas new batches of tokens were to be issued "in step with the construction of new facilities."[6]  Thus, certain Giga Watt ICO investors have been left with little more than the right to receive WTT Tokens at some undefined point in time which would supposedly allow them access to Giga Watt's, yet-to-be fully developed, mining services.

7.     In an effort to further entice investors to invest in the Giga Watt ICO, Defendants made various claims to the public that the value of Giga Watt Tokens was set to significantly increase and thus, they should invest sooner rather than later.  For example, Giga Watt tweeted on June 13, 2017, "[j]ust 3 days left till token prices increase! The new price will be $1.05 per token. Make sure to purchase before Friday."[7]  Similarly, on June 15, 2017, Cryptonomos, posted on the Bitcoin Forum, "[j]ust 1 day until WTT token price goes up! The new price will be $1.05 per token. Make sure to purchase before 12:00PM Pacific on Friday, June 16."[8]  Thus, investors were led to believe that they would receive a profit simply by investing early.

8.     By touting its "competitive services" and claiming that Giga Watt's "effective electricity cost" was, *inter alia*, "among the lowest feasible," Giga Watt was able to attract a significant amount of investors with promises that they would be part of a successful enterprise and "exclusive club"[9] which would provide miners a "full range of mining services from hosting, maintenance, and repair to private blockchain servicing" (the "Giga Watt Project").[10]

9.     From May 19, 2017 through June 2, 2017, Defendants ran the Giga Watt ICO "pre-sale," which had a minimum investment threshold of 10,000 Giga Watt Tokens, with each WTT Token costing between $1 and $1.2, depending on the date of acquisition.  Within the first three days

---

[6]     *Id*. at pg. 18.

[7]     *See* https://web.archive.org/web/20170619170615/https:/twitter.com/WTTtoken.

[8]     *See* msg. #585 at https://bitcointalk.org/index.php?topic=1914900.580.

[9]     *See* https://www.gigawatt.sg/about-us/.

[10]    White Paper, *supra* note 1, at pg. 4.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

of the Giga Watt ICO, Giga Watt's first two batches of WTT Tokens, equivalent to approximately $6.3 million, purportedly sold out, with each WTT Token representing 1 megawatt ("MW").[11]  By June 28, 2016, Giga Watt had raised approximately $11.8 million, more than 30% of its $30 million goal, with over a month left to go in the Giga Watt ICO.[12]

10.    Defendants made sure to construct the ICO to align their financial interests alongside the interests of WTT Token purchases.  Specifically, Giga Watt insiders were to receive 10 WTT Tokens and partners and advisors were to receive 5 WTT Tokens for every 100 WTT Tokens sold in the Giga Watt ICO.[13]  While Defendants have represented that the WTT Tokens to be dealt out to company insiders would be released out only when there are no token holders that have not received their WTT Tokens due to Giga Pods having not been completed yet,[14] Plaintiff is unaware as to whether Defendants have indeed honored such commitment.  Moreover, as to the WTT Tokens to be distributed to partners and advisors, the White Paper stated that such distribution would be "on a case by case basis."[15]  Thus, Defendants made sure to reserve the right to pay out WTT Tokens to their affiliates despite the fact that numerous investors have been left waiting for the issuance of their WTT Tokens by Giga Watt.

11.    The Giga Watt ICO was a clear offer and sale of securities because, *inter alia*, Plaintiff, and other similarly situated investors: (i) invested money; (ii) into a common enterprise (the Giga Watt Project); and (iii) with the expectation of receiving WTT Tokens which would purportedly provide investors access to a functional and successful mining service, thereby allowing their WTT Tokens to increase in value and produce substantial returns.  Additionally, the failure or success of the Giga Watt Project was entirely dependent on Defendants' managerial efforts.

---

[11]    *See* https://www.coinspeaker.com/2017/06/08/first-two-batches-giga-watt-projects-tokens-wtt-sold-three-days/.

[12]    *See* https://www.financemagnates.com/cryptocurrency/news/bitcoin-mining-facility-giga-watt-raises-11m-first-weeks-crowdsale/.

[13]    White Paper, *supra* note 1, at pg. 19.

[14]    *Id*.

[15]    *Id*.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    Furthermore, Defendants have even referred to token purchasers as "investors."  For example, during

2    an interview with *Bitcoin Magazine*, when asked, "[a]re you still planning an ICO for Giga Watt?  If

3    so, will this be a registered security," Carlson replied, "[w]e've been working very hard to come up

4    with a product or service that gives **anyone — not just accredited investors** — access to our

5    blockchain processing facility infrastructure." (emphasis added).[16]

6         12.    Although Defendants stated that their goal was "to offer the token holders access to

7    both an exciting new world of technology and the cryptocurrency mining business" which included

8    "access to Giga Watt's facility at unprecedentedly low hosting rate[s],"[17] many investors have not

9    received their promised WTT Tokens in the timeframe represented in the White Paper.  Given the

10    fact that Defendants have been unsuccessful in creating the Giga Pods they promised, the WTT

11    Tokens that Plaintiff and the Class purchased in the ICO have not represented the value or income-

12    generating properties that investors believed they were purchasing.

13         13.    The Securities Act's registration requirements are designed to protect investors by

14    ensuring they are provided adequate information upon which to base their investment decisions.

15    Absent registration, issuers of securities are able to tout their investment opportunities with no

16    limitations whatsoever.  For example, an issuer could omit any information that would make a

17    potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core

18    product lines), or peddle its securities using unbounded exaggerations regarding the progress of its

19    products, business plan, business strategies, or even fabricate the existence of relationships with

20    vendors or other business partners.

21         14.    Due to the varied and innumerable ways in which investors can be, and are likely to

22    be, manipulated and harmed absent any of the protections under the federal securities laws, Sections

23    5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells

24    an unregistered security.  As detailed herein, the Giga Watt ICO was, and has been at all times, been

25

26   [16]     *See* https://bitcoinmagazine.com/articles/giga-watt-ceo-we-desperately-need-balance-power-mining-space/.

27   [17]     White Paper, *supra* note 1, at pg. 12.

CLASS ACTION COMPLAINT - 5

an offer and sale of unregistered securities and thus, Defendants are strictly liable under Section 12(a)(1) of the Securities Act.

15.    Importantly, proof of Defendants' calculated deprivation of investors' rights and protections under the federal securities laws is not required or determinative as to Plaintiff's claim. This is because Defendants are liable simply by virtue of having offered and sold unregistered securities during the Giga Watt ICO.    Nevertheless, Defendants' clear intentional attempt to circumvent registration requirements under the Securities Act are outlined herein to stress the urgency and need for immediate judicial intervention to preserve Plaintiff's and other Giga Watt ICO investors' significant financial interests which Defendants currently control, and to rectify existing and future irreparable harm to Plaintiff and Giga Watt ICO investors.    For these reasons, Plaintiff on behalf of himself, and all similarly situated Giga Watt ICO investors, seeks compensatory, injunctive, and rescissory relief, which would provide rescission and repayment of all investments into the Giga Watt ICO, as well as secure and conserve such funds until repayment.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction under 28 U.S.C. § 1367 (supplemental jurisdiction), 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act (15 U.S.C. § 77v) because Plaintiff alleges violations of Sections 12(a)(1) and 15(a) of the Securities Act.

17.    This Court has personal jurisdiction over each of the Defendants because each has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

## PARTIES

2  *Plaintiff*

3       19.     On July 17, 2017, Plaintiff used .999564 ETH to purchase a total of 162 WTT Tokens

4  in connection with the Giga Watt ICO through Cryptonomos' website, https://wtt.cryptonomos.com/

5  (the "ICO Website").  As of March 12, 2018, Plaintiff's 162 WTT Tokens is worth approximately

6  $162.00.  In contrast, as of March 12, 2018, the .999564 ETH Plaintiff invested in the Giga Watt

7  ICO is worth approximately $700.00.

8  *The Corporate Defendants*

9       20.     Defendant Giga Watt, Inc. is a Washington corporation that was incorporated on

10 December 15, 2016 and has its principle place of business on 1 Campbell Pkwy, East Wenatchee,

11 Washington 98802. Giga Watt, Inc. offers mining solutions and hosting services at its Wenatchee,

12 Washington facilities.

13      21.     Defendant GigaWatt Pte. Ltd. is a privately held, foreign for-profit corporation that

14 was incorporated on March 29, 2017, and which maintains its headquarters at 1 Coleman Street #08-

15 07, Adelphi, Singapore.  GigaWatt Pte. Ltd. sells mining equipment to customers worldwide.  Such

16 mining equipment is installed and hosted at Giga Watt, Inc.'s mining facilities.  Upon information

17 and belief, GigaWatt Pte. Ltd. is a subsidiary of Giga Watt, Inc.

18      22.     Defendant Cryptonomos Pte. Ltd. is a foreign, for-profit corporation that was

19 incorporated on September 20, 2016, and which maintains its headquarters at 1 Coleman Street #08-

20 07, Adelphi, Singapore.  Cryptonomos operates as a crowd funding platform for entities that wish to

21 conduct initial coin offerings.  Cryptonomos participated in the sale of WTT Tokens in connection

22 with the Giga Watt ICO by soliciting investors.  Moreover, purchases of WTT Tokens were made by

23 investors through the Cryptonomos' Website.

24      23.     Upon information and belief, Cryptonomos is an affiliate of Giga Watt, Inc., as

25 Cryptonomos maintains the same business address and suite number as Giga Watt Pte. Ltd.

26 *The Individual Defendant*

27      24.     Defendant Carlson is the Chief Executive Officer ("CEO") and founder of Defendant

CLASS ACTION COMPLAINT - 7

Giga Watt, Inc., and upon information and belief, currently controls Defendant Giga Watt, Inc. and Defendant GigaWatt Pte. Ltd.  Carlson actively promoted the sale of WTT Tokens in the Giga Watt ICO through interviews and presentations to the public and acted as the head of the Giga Watt Project in connection with the Giga Watt ICO.

## CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this action individually and as a class action on behalf of all individuals and entities who transferred to Giga Watt any fiat currency or digital currency to invest in the Giga Watt ICO (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant.

26.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

27.    While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in this Class.  All members of the Class may be identified by records maintained by Defendants and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

28.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following: (i) whether Defendants offered and sold unregistered securities in violation of the federal securities laws; (ii) whether Plaintiff and other Class members will suffer irreparable harm if such securities laws violations are not remedied; and (iii) whether the Class is entitled to compensatory, injunctive, and/or rescissory relief as a result of Defendants' wrongful conduct as alleged herein.

29.    Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class.  Additionally, Plaintiff and the other members of the Class have all sustained harm in a substantially identical manner as a result of Defendants' wrongful conduct as alleged herein.

CLASS ACTION COMPLAINT - 8

30.     Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in litigation of this nature.

31.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

32.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

33.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

34.     Accordingly, Plaintiff seeks compensatory, rescissory, injunctive, and other equitable relief on behalf of himself and the Class to prevent the irreparable injury they will continue to suffer absent judicial intervention.

## SUBSTANTIVE ALLEGATIONS

### Background on Coin Mining

35.     Coin mining is a process by which transactions are verified and added to certain public ledgers known as "blockchains," and also one method through which certain new digital currencies are released.

36.     A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves and presents information.  The general idea is that each "block" contains information, such as details on transactions that are made.  After a "block" is created (with cryptography so as to verify its contents), the information inside of it cannot be changed.  The "block" then becomes part of the "blockchain" and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in the chain.  After this process is complete, then another block is created with additional information and so on and so forth.

CLASS ACTION COMPLAINT - 9

37.     To date, most "blockchains" are used to record transactions involving digital currencies (e.g., BTC and ETH). However, a "blockchain" could be used to record all types of information. For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

38.     Anyone with access to the internet and requisite hardware can participate in mining. The mining process involves compiling blocks and trying to solve a computationally difficult puzzle. Typically, the miner who first solves the puzzle gets to place the next block on the blockchain and claim a reward. The rewards, which incentivize mining, are typically both the transaction fees associated with the transactions compiled in the block as well as newly released digital currency that the participant has chosen to mine. With most digital currencies a miner chooses to mine, there is a finite amount of that particular digital currency that can ever exist. Despite this, coin miners are capable of reaping significant profit depending on the hardware and equipment they use to mine such digital currencies. This is because better hardware and equipment increases the likelihood that a miner will be the first to solve the computationally difficult puzzle and obtain the reward.

### Background on the Giga Watt Project

39.     In 2012, Carlson founded MegaBigPower, which was a megawatt-scale BTC mining center and purportedly "one of the largest single-operator mines in the world." In approximately March 2017, Carlson rebranded MegaBigPower as Giga Watt, a blockchain hosting and servicing center for mining hardware. At the time Carlson rebranded MegaBigPower to Giga Watt, Giga Watt had completed the construction of three (3) mining facilities originally designed by MegaBigPower, consisting of 1 MW, 1 MW, and 0.25 MW. According to Giga Watt's website, only eight (8) out of the eleven (11) Giga Pods in Moses Lake, Washington (the "Moses Lake Site") have been fully built, whereas one (1) out of eleven (6) Giga Pods scheduled for development at the "Pangborn Development Site" (the "Pangborn Site") in Washington have been fully constructed.[18]

40.     According to the White Paper, the Giga Watt Project is a "partnership" between Giga

---

[18]     *See* https://giga-watt.com/promo/timeline.

CLASS ACTION COMPLAINT - 10

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

Watt, Inc. and GigaWatt Pte. Ltd., pursuant to which Giga Watt, Inc. provides, *inter alia*, mining facilities and "turnkey mining services," and GigaWatt Pte. Ltd sells the mining equipment used in Giga Watt's mining facilities.[19]  The "standard turnkey solution" Giga Watt, Inc. would provide was described as:

> [P]urchase and delivery of mining equipment through its Partner with its subsequent setup and hosting at Giga Watt's facilities in Wenatchee, WA, with hosting fees starting as low as 7.5 USD cents/kW/hour4, zero setup fees (for equipment purchased through its Partner) and uniquely low minimum facility entrance threshold of 1 miner of any model.[20]

41.    Despite Defendants' representations that GigaWatt Pte. Ltd. is a mere "partner" of Giga Watt, upon information and belief, Carlson owns and operates GigaWatt Pte. Ltd. as a subsidiary of Giga Watt, Inc.

42.    Giga Watt's pricing structure for its standard turnkey solution consists of a one-time charge for the purchase of mining equipment and daily deductions for hosting services. These payments include electricity costs, a maintenance fee, and a facility rent fee.  Anyone who chooses to use their own mining equipment instead of the mining equipment Giga Watt offers gets charged the same hosting fees but is also charged an additional setup fee.

43.    The purported technology that Giga Watt uses to provide its standard turnkey solution is what it calls "Giga Pod solution."  Giga Watt claimed that these Giga Pods were, *inter alia*, highly efficient, minimized costs "in every aspect of mining operations," provided flexibility for "record-fast expansion of [their] capacity," and "minimize[d] construction costs."[21]

44.    Defendants boasted about Giga Watt's mining technology and how purportedly efficient its Giga Pods and mining equipment were in an effort to collect as much money from investors as it could, with the promise that these investors would receive WTT Tokens that would increase in value alongside the success of the Giga Watt Project and/or that investors would be issued such tokens upon the development and completion of the Giga Pods.  However, only eight (8)

---

[19]      *White Paper, supra* note 1 at pg. 5.

[20]      *Id*.

[21]      *Id*. at pg. 10.

CLASS ACTION COMPLAINT - 11

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

of the eleven (11) Giga Pods have been built in the Moses Lake Site and only one (1) of the Giga Pods have been built at the Pangborn Site, leaving the portions of the fourth batch of WTT Tokens, which was scheduled to be released by September 15, 2017 ("Batch 4"), unissued.  In this regard, Giga Watt issued a press release on December 14, 2017 stating that some Batch 4 WTT Tokens would "fall outside the time frame of our original target maximum delivery date according to the whitepaper."[22]

45.     Additionally, Giga Watt explicitly stated that "after 10pm UTC on July 24th, 2017" purchasers of WTT Tokens would be "entitled to a refund of" WTT Tokens purchased "in the original form of payment."[23]   Whether such refunds were actually honored is not entirely clear. However, the fact that Defendants' failed to fully accomplish the goals outlined in the White Paper and have generally been unsuccessful in managing the Giga Watt Project negatively affects all WTT Token holders, not only investors who have yet to receive their WTT Tokens.  That is, given that Giga Watt has not achieved its business plan, the WTT Tokens purchased are not worth what Defendants led every Giga Watt ICO participant to believe they would be worth.

46.     Giga Watt conveyed the release of each batch in its White Paper under the "Projected Construction Timeline,"[24] which stated:

3 units, 2.25 MW are available right now

[Batch 1]

- July 15, 2017: 1 Giga Pod completed, 0.75 MW

[Batch 2]

- August 1, 2017: 2 Giga Pods completed, 2.4MW

- August 15, 2017: Expansion of the unit, 0.9 MW

[Batch 3]

---

[22]     See https://medium.com/@gigawatt/announcement-regarding-batch-4-tokens-f669748f08b8. (the "December 2017 Press Release")

[23]     *Id*.

[24]     White Paper, *supra* note 1 at pgs. 20–21.

CLASS ACTION COMPLAINT - 12

- September 1, 2017: 3 Giga Pods completed, 4.5 MW

[Batch 4]

- September 15, 2017: 9 Giga Pods completed, 15 MW

[Batch 5]

- October 1, 2017: 3 Giga Pods completed, 4.5 MW

[Batch 6]

- November 15, 2017: 3 Giga Pods completed, 4.2 MW

The "3 units, 2.25 MW" Giga Watt refers to are the three (3) mining facilities originally designed by MegaBigPower, consisting of 1 MW, 1 MW, and 0.25 MW. As indicated above, these mining facilities were developed and functional prior to the Giga Watt ICO. In addition to the Giga Pods constructed at the Moses Lake Site and Pangborn, these three facilities are the only Giga Pods that are fully developed and functional for investors to utilize. Thus, despite representing to investors that these Giga Pods would be built in the specified date listed in the White Paper, Plaintiff, and other similarly situated investors, have been left with WTT Tokens that have little to no functional uses, minimal monetary value, and for some investors, the mere future (a future that may never materialize) right to receive WTT Tokens.

### The Giga Watt ICO

47.     The Giga Watt ICO "Token Launch" consisted of a public offering of 30 million WTT Tokens for $1 to $1.20 per WTT Token. The Giga Watt ICO ran between June 2, 2017 and July 31, 2017. The Giga Watt ICO had a minimum investment threshold of 1 WTT which was equivalent to $1 to $1.20. In May 2017, Defendants released the White Paper which essentially highlighted the purpose and goals of the Giga Watt Project and the terms of the Giga Watt ICO. According to the White Paper, Giga Watt conducted a pre-sale between May 19, 2017 and June 2, 2017, during which time investors were able to purchase WTT Tokens with a minimum entry threshold of 10,000 WTT Tokens, which is equivalent to $10,000. Investors acquired WTT Tokens using BTC, ETH, and fiat currencies (such as EUR, and USD) via the ICO Website hosted by Cryptonomos. Upon information and belief, Cryptonomos is an affiliate of Giga Watt, as Andrey

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Kuzenny, the Chief Coordinator of Giga Watt, is also the co-founder of Cryptonomos.  Moreover, Cryptonomos maintains the same business address and suite number as Giga Watt Pte. Ltd.

48.     The White Paper describes a WTT Token as "an Ethereum token representing the right to use the Giga Watt processing center's capacity, rent-free for 50 years, to accommodate 1 Watt's worth of mining equipment power consumption."[25]  Thus, investors who wanted to use their mining equipment in Giga Watt's mining facilities were encouraged to purchase the number of WTT Tokens equal to their equipment's power consumption.  Investors expected to receive a return on their investment in WTT Tokens in the following ways: (1) utilize the WTT Tokens in order to mine coins using Giga Watt's Giga Pods; (2) rent out their WTT Tokens to other miners; (3) or sell WTT Tokens on an online exchange that allows the trading of WTT Tokens.  With respect to the ability to profit from investing in the Giga Watt ICO, Cryptonomos responded as follows to a post made by a wary potential investor who feared the inability to "get out" of his investment:

> You can sell WTT tokens as soon as they go on exchanges - we will announce exchange list later. Also, you are able to use tokens for your own miners to save on hosting, as well as rent out tokens to other miners to get rental income. So there are a few way to make use of WTT tokens, and by no means you are tied up to anything[.][26]

49.     Additionally, the right to buy and host Giga Watt's mining equipment are exclusive to holders of WTT Tokens.  In this regard, Giga Watt further enticed investors to purchase WTT Tokens when it announced in or about June 2017:

> We are writing to you to announce an important and exciting change. Due to overwhelming demand for Giga Watt's equipment hosting services the Giga Watt project is discontinuing, for an indefinite period of time, the option of buying and hosting mining equipment for clients who do not own WTT tokens.
>
> From now on, the orders to buy and host mining equipment are accepted only from the clients who, at the time of their equipment or hosting service order, already own WTT tokens, and the number of their WTT tokens is ample to cover the energy consumption of all the equipment or hosting service they are ordering.[27]

---

[25]     *Id*. at pg. 12.

[26]     *See* https://bitcointalk.org/index.php?topic=1914900.220.

[27]     *See* https://steemit.com/cryptocurrency/@pedrombraz/good-news-for-gigawatt-wtt-token-holders.

CLASS ACTION COMPLAINT - 14

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

50.    Within the first three days of the Giga Watt ICO, Giga Watt's first two batches of WTT Tokens, equivalent to approximately $6.3 million, and by the end of June 2017, Giga Watt had raised approximately $11.8 million which was equivalent to more than 30% of its $30 million goal. By the end of the Giga Watt ICO, Giga Watt had raised approximately $22.3 million and transferred the funds received by investors into an escrow account held by international law firm Perkins Coie LLP.

51.    Giga Watt represented to investors that the WTT Tokens investors purchased in connection with the Giga Watt ICO would be released from escrow and issued to the investors upon the completion of the requisite Giga Pod facilities.  According to the White Paper, Giga Watt was supposed to issue Batch 4 by September 15, 2017.  However, not all Batch 4 WTT Tokens have been issued to investors because the ninth Giga Pod scheduled for completion on September 15, 2017 have yet to be fully developed.  Thus, as of the date of this filing, numerous investors have yet to receive their WTT Tokens and construction of the 9th Giga Pod has been delayed for over four months.

52.    With respect to such continuous delays, Giga Watt issued a press release on December 14, 2017, which stated:

> Despite our best efforts, the delivery of the final portion of the Batch 4 WTT will fall outside the time frame of our original targeted maximum delivery date according to the whitepaper.
>
> Batch 4 tokens that were purchased before 10pm UTC on July 24th, 2017, will be issued on 25th December, 2017.
>
> Any WTT that were purchased after 10pm UTC on July 24th, 2017, are expected to be delayed. It is estimated that the power for these tokens will be ready by the end of February, at which time we should be able to issue your WTT. If your tokens were bought after 10pm UTC on July 24th, 2017, you are entitled to a refund of your WTT tokens in the original form of payment, and will receive the USD amount that was paid when the tokens were bought.
>
> As gratitude for your continued patience, we'd like to offer token holders who purchased their tokens after 10pm UTC on July 24th, 2017, a bonus of 10% additional tokens.
>
> We are making good progress, but it hasn't been easy!

CLASS ACTION COMPLAINT - 15

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

If you plan to hold, we will issue your 10% bonus tokens automatically.

If you plan to hold, we will issue your 10% bonus tokens automatically. Please email all refund related inquiries to: refund@cryptonomos.com

December 2017 Press Release.[28]

53.    Despite massive delays in the construction of Giga Pods resulting in numerous investors not receiving their WTT Tokens, Defendants have already reserve and/or issued 15 WTT Tokens to themselves and their affiliates for every 100 WTT Tokens sold in the Giga Watt ICO. This means that if $22.3 million was raised by the Giga Watt ICO and WTT Tokens were purportedly sold for approximately $1.00 each, Giga Watt members and affiliates have reserved/issued themselves approximately $3.4 worth of WTT Tokens.

54.    Further, not only have Defendants failed to meet the timeline it represented, but even when they finally delivered mining products and Giga Pods, the quality of such mining services has been found lacking.  For example, investors have made numerous public statements that Giga Watt's mining equipment has repeatedly broken down or did not perform as advertised.[29]  Given the fact that the value and use of WTT Tokens is tied to Defendants' ability to create and manage the Giga Watt Project, all Giga Watt ICO investors have been negatively affected by such failures.

**WTT Tokens Constitute "Investment Contracts"**

55.    The facts are indisputable that Defendants participated in the offer and sale of WTT Tokens.  Similarly, it is indisputable that the value of WTT has at all times been dependent of whether Defendants could successfully create and manage the Giga Watt Project.  The Giga Watt Project is developed, operated, and maintained by the Defendants.  Given that the Giga Watt ICO was conducted by Giga Watt, through Cryptonomos' (a reasonably likely affiliate of Giga Watt) website, it is indisputable that Cryptonomos was instrumental in orchestrating and operating the Giga Watt ICO.  Similarly, Carlson, as the CEO and founder of Giga Watt, Inc., clearly controlled

---

[28]    *See, supra* note 22.

[29]    *See* generally, https://www.facebook.com/gigawattcom/ (Giga Watt Facebook page containing numerous posts from investors reporting issues relating to delays and quality of mining services).

CLASS ACTION COMPLAINT - 16

and orchestrated Giga Watt's actions in conducting the Giga Watt ICO.

56.    Under the federal securities laws, the definition of a security includes an "investment contract."  Plaintiff's and the Class' investments of BTC, ETH, and fiat currencies constitute an investment of money in an "investment contract."

57.    When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction.  Here, the economic realities are that Plaintiff and the Class invested their digital currencies and fiat currency in order to receive WTT Tokens, which Plaintiff and the Class reasonably expected would generate a profit in multiple ways.  Specifically, the Tokens were expected to provide value by way of using them to mine cryptocurrencies/digital currencies, trading them for profit, or lending them to others to mine cryptocurrencies/digital currencies.  Such economic value to be received by Plaintiff and the Class has at all times been entirely dependent on the Defendants' technical and managerial efforts to fully develop and launch the Giga Watt Project.

58.    Further, Plaintiff and the Class invested in the common enterprise that is the Giga Watt Project.  That is, Giga Watt ICO investments were pooled under the control of the Defendants, and the success of the Giga Watt Project—and thus the potential profits stemming from the efficiency and effectiveness of Giga Watt's mining facilities and equipment, which was expected to ultimately effect the value and utilization of WTT Tokens—was entirely reliant on Defendants' actions.

59.    Accordingly, it is obvious that any success from creating the WTT Token and future potential increases to the WTT Token's value was entirely dependent on Defendants' actions.

60.    Furthermore, it is abundantly clear that Defendants were fully aware that they were selling unregistered securities and depriving public investors of their rights and protections under the federal securities laws.  Indeed, as Carlson stated during an interview, Defendants had "been working very hard to come up with a product or service that gives **anyone — not just accredited**

CLASS ACTION COMPLAINT - 17

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**investors** — access to our blockchain processing facility infrastructure." (emphasis added).[30]

61.     Astoundingly, despite the fact that Defendants deprived Plaintiff and the Class of their rights and protections under the federal securities laws, they even attempted to protect themselves using the safe-harbor protections for registered issuers providing "forward-looking statements" under these same laws.  For example, the Giga Watt White Paper included a "Legal Disclaimer" which stated "[c]ertain statements, estimates and financial information contained in this White Paper constitute forward-looking statements or information."[31]  Unfortunately for Defendants, such safe-harbors are not available for issuers selling unregistered securities.  Evidently, Defendants were attempting to reserve protections for themselves under the federal securities laws whilst simultaneously depriving Plaintiff and the Class their rights and protections under the same laws.  Such actions demonstrate the clear inequity of Defendants actions in connection with the Giga Watt ICO.

***Necessity for Judicial Intervention***

62.     On July 25, 2017, the SEC issued a report on "the DAO," which offered tokens for sale online, in which the SEC advised those using "distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance" with the federal securities laws, and stated that "[a]ll securities offered and sold in the United States must be registered with the Commission . . ." or qualify for an exemption from registration.  On the same day, the SEC issued an investor bulletin urging caution when investing in ICOs and to be mindful that promoters and initial sellers that lead buyers of tokens to expect a return on their investment or participate in shared returns provided by the project may be offering a security for sale.

52.     On September 29, 2017, the Wall Street Journal reported Chairman Clayton as stating "I have yet to see an ICO that doesn't have a sufficient number of hallmarks of a security."  This statement sums up the core issue here quite succinctly.  Digital currencies are a relatively new

---

[30]     *See supra* note 16.

[31]     White Paper, *supra* note 1 at pg. 3.

CLASS ACTION COMPLAINT - 18

phenomenon and various parties are taking advantage of the time it takes for regulatory agencies to address new developments to engage in unlawful conduct with near impunity, as Defendants have here by raising tens of millions of dollars with promises of profits and income-generating opportunities stemming from supposedly efficient mining facilities, many of which have yet to materialize.

53.     On December 1, 2017, the SEC filed a complaint against PlexCorps for selling unregistered securities in connection with the "PlexCoin Token" ICO.  Similarly, on December 11, 2017, the SEC announced that it had shut down an ICO that Munchee, Inc., a California-based online food review company, had been planning on conducting.

54.     Defendants have promoted the Giga Watt ICO by making claims that the value of WTT Tokens was likely to significantly increase and repeatedly stressing  the multiple ways investors could "make use" of WTT Tokens to generate income and profit.  The value of WTT Tokens was at all times expected to result from Defendants' ability to create low-cost, efficient, "Giga Pods" where cryptocurrency/digital currency mining could occur (*i.e.*, run the Giga Watt Project).  Plaintiff and the Class believed Defendants' timeline for the construction of these Giga Pods and their expectations of what the WTT Tokens would be worth were, in large part, based on the veracity of such representations.  However, Defendants have repeatedly failed to meet these self-imposed timelines.

55.     Further, given the significant nature of such failure and the length of delays it is reasonable to infer that Defendant's knew, or should have known, that the timeline used to solicit investments was unrealistic.  Indeed, had Defendants' registered their securities they likely would have thought twice, and then a third time, about ensuring they solicited investments using more realistic business plans and timelines.  Moreover, had Defendants registered their offering, the SEC would have reviewed their issuing documents for, among other things, logical inconsistencies such as unrealistic timelines for massive construction projects, prior to such documentation being approved for use in soliciting public investments.  However, Defendants consciously chose not to

CLASS ACTION COMPLAINT - 19

register the Giga Watt ICO or the WTT Tokens and their unlawful conduct in offering and selling unregistered securities in connection with the Giga Watt ICO has harmed Plaintiff and the Class.

56.    Investors like Plaintiff and the Class have already been wrongfully deprived of the protections of the federal securities laws by Defendants.  Fortunately, the private right of action provided for by Section 12(a)(1) of the Securities Act was created for just this type of situation, and provides strict liability for the sale of unregistered securities.

## CLAIMS FOR RELIEF

## COUNT I

### Claim for Violation of Section 12(a)(1) of the Securities Act
### Against All Defendants

57.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

58.    Section 12(a)(1) grants Plaintiff a private right of action against any person who offers or sells a security in violation of Section 5 and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

59.    From May 19, 2017 through July 31, 2017, in connection with Giga Watt ICO, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of the Securities Act.  Specifically, Giga Watt, Inc., Giga Watt Pte. Ltd., and Carlson conducted the Giga Watt ICO through Cryptonomos Pte. Ltd.'s website.

60.    The offer and sale of WTT Tokens in the Giga Watt ICO constituted the offer and sale of unregistered securities under controlling federal law.  WTT Tokens exhibit the following particular hallmarks of a security under the *Howey* test: (a) in order to receive any WTT Tokens, an investment of money, in the form of BTC, ETH, and/or fiat currencies was required; (b) the investment of money was made into the common enterprise that is Defendants' Giga Watt Project and; and (c) the success of the investment opportunities and any potential returns thereon were

CLASS ACTION COMPLAINT - 20

entirely reliant on Defendants' ability to provide a functional, cost effective and "competitive mining" service.

61.     As such, Defendants have participated in the offer and sale of unregistered securities in violation of the Securities Act and are liable to Plaintiff and the Class for rescission and/or compensatory damages.

## COUNT II

### Claim for Violation of Section 15(a) of the Securities Act
### Against Defendant Carlson

62.     Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

63.     Due to his ownership in and/or control over Defendant Giga Watt, Inc., Defendant Carlson acted as a controlling person of Giga Watt, Inc. within the meaning of Section 15(a) of the Securities Act as alleged herein.  By virtue of his positions as the founder and CEO of Giga Watt, Inc., and participation in and/or awareness of Defendant Giga Watt Inc.'s operations, Defendant Carlson had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the Giga Watt ICO, including the decision to engage in the sale of unregistered securities in furtherance thereof.

64.     By virtue of the foregoing, Defendant Carlson is liable to Plaintiff and the Class as a control person of Defendant Giga Watt, Inc. under Section 15(a) of the Securities Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.     Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

C.     Declaring Defendants are liable to Plaintiff and the Class under Sections 12(a)(1) and/or 15(a) of the Securities Act;

D.     Preliminarily enjoining Defendants from making further transfers or dissipations of the investments raised from the offer and sale of WTT Tokens in connection with the Giga Watt

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

ICO, or using such funds in any further purchases or transactions;

E.     Requiring an accounting of the funds and assets raised from Plaintiff and the Class in connection with the Giga Watt ICO;

F.     Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiff and the Class;

G.     Ordering rescission of the investments made by Plaintiff and the Class relating Giga Watt ICO and/or compensatory damages;

H.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

I.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: March 20, 2018

Respectfully submitted,

**BRESKIN JOHNSON & TOWNSEND PLLC**

By: s/ Roger Townsend
     Roger M. Townsend, WSBA #25525
     1000 Second Avenue, Suite 3670
     Seattle, WA 98104
     Tel: 206-652-8660
     Fax: 206-652-8290
     rtownsend@bjtlegal.com

**OF COUNSEL**

Donald J. Enright (to be admitted *pro hac vice*)
Email: denright@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile: (202) 333-2121

*Attorneys for Raymond Balestra*

CLASS ACTION COMPLAINT - 22